**MICHAEL SNELLING vs. OFFICER STROY**
Michael Snelling on 05/30/2017                   Pages 22..25

**Page 22**

1  the cell.
2  Q. Okay.
3  A. Around 1 and 2 p.m. Officer Stroy came and said, Cell
4  14, this is your free time, do whatever you want to do. Okay.
5  I didn't know he was out of his cell, Inmate Thomas. I didn't
6  know he was out of his cell. But I'm at the kiosk, which is
7  the system that you order your commissary --
8  Q. Okay.
9  A. I had to run and get ready to go back upstairs to
10 sleep. My roommate -- I'm trying to think of his name.
11 Q. That's okay. You can just call him your roommate.
12 A. He had a call out to medical. At that time --
13 Q. Meaning that he was gone to medical?
14 A. Right, at 700.
15 Q. Okay.
16 A. So 700 and 600 is side by side each other. And you
17 have cameras in each every cell on the floor and in the zone.
18 Q. Okay.
19 A. At that time I didn't pay no attention. My glasses
20 got broke and all of this was hanging below my eye. He stabbed
21 me with a weapon.
22 Q. Where did he stab you?
23 A. By my right eye.
24 Q. By my right eye.
25 A. Officer Stroy, he talked the officer of taking

**Page 23**

1  handcuffs off of him and let him walk to his cell by himself.
2  The officer stood there. This inmate has no handcuffs on him.
3  So he's at the red zone of the door at the entrance of the jail
4  on the 7th side of 600.
5  Q. Okay.
6  A. At that time I didn't notice nothing. There's two
7  sets of stairs in the Fulton County Jail.
8  Q. And let me stop you. You're claiming -- why should
9  he have had handcuffs on?
10 A. Because that's the rule.
11 Q. Okay.
12 A. Anytime you're in admin lockdown, you must have
13 handcuffs on.
14 Q. Okay. And so he was on admin lockdown because of the
15 phone and you were on admin lockdown because of the marijuana?
16 A. No, no. I wasn't on lockdown.
17 Q. Oh, you weren't? Okay.
18 A. I just wanted to be there.
19 Q. Oh, okay.
20 A. Because it's getting away from the irritation.
21 Q. So there was nothing that caused you to be on
22 lockdown?
23 A. No.
24 Q. But he was on lockdown because of the phone?
25 A. Yeah.

**Page 24**

1  Q. Thomas?
2
3  A. Yeah.
4  Q. Okay.
5  A. And plus he was GD and, you know, --
6  Q. Meaning part of a gang?
7  A. Right. Right. So he can be on the upper floor.
8  Q. Okay.
9  A. To make the story short, he didn't come up to the
10 stairs by the camera where Officer Stroy was standing at. He
11 bypassed those stairs.
12 Q. When you say, he, you talking about Thomas?
13 A. Thomas.
14 Q. Okay.
15 A. He bypassed the stairs, came up towards my way where
16 the kiosk is at up to the other stairs because his room was
17 610. Swear under oath, without a doubt, I hit the floor so
18 hard. There's a scar right here to prove it. I have a plate
19 in my neck. I was pronounced dead before I got on the gurney.
20 At that time I stayed in the hospital for a total of 11 days.
21 I didn't get out of the hospital until about January.
22 Q. Okay.
23 A. All I'm saying that Officer Stroy had a job to do and
24 he did not do the job right. And what he did he stood there
25 and watched this inmate jump me. And when I passed out, I went

**Page 25**

1  into a seizure, which they said a coma. And I blacked out.
2  Q. Well, I want to ask you a couple of questions. So
3  first off you said he stood there and watched the inmate jump
4  you. Did you know the inmate was about to jump you?
5  A. No.
6  Q. Well, how -- and this is pure speculation, but how
7  would Officer Stroy have known that the inmate was about to
8  jump you?
9  A. Because me and that -- I'm going to be truthful. Me
10 and the inmate had a problem because every time my cell mate
11 would say something about him or something or, you know, being
12 too friendly, and I don't get along with people because of my
13 mental health issues.
14 Q. Okay.
15 A. Not to bring that up in the record.
16 Q. I understand.
17 A. I don't get along with certain people. I'm a loner.
18 I'm just -- you know, don't ask me for nothing. Don't bother
19 me. Don't get me involved.
20 Q. Okay. So you had a conflict with Thomas?
21 A. So that's right.
22 Q. And what was the conflict a result of?  *No MS*
23 A. It had something to do with my cell mate.
24 Q. Okay.
25 A. And he was the cause of it because I believe my cell

**MICHAEL SNELLING vs. OFFICER STROY**
Michael Snelling on 05/30/2017
Pages 26..29

### Page 26

1  mate wasn't -- Thomas wouldn't let him use the phone.
2  Q. Oh, okay. I see.
3  A. Where I was in the wrong by putting money on this
4  phone.
5  Q. I see.
6  A. He didn't mention he had a phone. It went on the
7  wall phone, so I had to get my people to reverse it to that.
8  That came to a big problem. So I had it stopped because I
9  didn't know he stole somebody else's phone.
10 Q. So the conflict was basically because you cut off
11 access to somebody's phone?
12 A. Right.
13 Q. I'm following you. Okay.
14 A. And there was a contract involved. He said there was
15 going to be four people; me and him -- and I had the tablet. I
16 made phone calls. Okay? But he lied to me and said it was
17 going to be four people. You've got zone 6, 100, 200, 300
18 riding off $163.
19 Q. This is your roommate you're referring to?
20 A. Inmate Newton Thomas -- Well, Thomas.
21 Q. All right.
22 A. Officer Stroy was one day -- I can't think back, but
23 it was somewhere between -- around November. Thomas was asking
24 him to bring another phone in because he was trying to sell
25 them. So he came to my cell one day showing me different

### Page 27

1  phones, how much they cost. They were like $30, $40, depending
2  on what you get.
3  Q. Okay.
4  A. So I said I'm not getting involved with this. So I
5  told my people about it. So before the accident happened --
6  Q. And who were your people?
7  A. I'm fixing to get you the names now.
8  Q. Okay.
9  A. Khajedius -- I can't say it. It's K-h-a-j-e-d-i-u-s?
10 Q. That's your girlfriend? *Right Name = KHADEJIA*
11 A. No.
12 Q. Oh, okay.
13 A. Just a friend.
14 Q. Okay. Just a lady friend?
15 A. Yeah.
16 Q. Okay.
17 A. Cause she do my money for me.
18 Q. Okay. So just a family member? Do you keep in touch
19 with Khajedius? *Right Name: khadedia*
20 A. All the time.
21 Q. Okay.
22 A. So I had her to contact classification to have me
23 moved before anything took place and it was never done. She
24 said she called the jailer, which was the other jailer and he
25 didn't do nothing. Major Walker is involved. Sergeant Grill *Right Name: Sgt J. Gredner*

### Page 28

1  (ph), he's the one who got me to Grady Hospital when it took
2  place.
3  Q. Okay.
4  A. I'm trying to think of some other names. The
5  sergeant that worked with Officer Stroy, I can't think of his
6  name. He's a black male. Anyway, he said he was going to
7  handle it by trying to get him to see a lawyer and have
8  somebody come talk to me. He never did.
9  Q. Okay.
10 A. So I talked to Major Walker. They had me on MSU or
11 something like that, MOU, which was something like protective
12 custody. They had me on the 6th floor.
13 Q. Okay. Because you had been getting threats from
14 Inmate Thomas?
15 A. Other inmates, yes.
16 Q. Oh, other inmates?
17 A. Other inmates.
18 Q. Including Thomas?
19 A. Yes.
20 Q. Okay.
21 A. And it's all through the phones. All they do is send
22 one text or phone call, which everybody had everybody's phone
23 number in that jail.
24 Q. Okay.
25 A. And that's what took place.

### Page 29

1  Q. Okay.
2  A. I almost had a fight on 6 North and I was in a
3  one-man cell where all of my commissary was stolen. Then I
4  almost got stabbed up. Then going to court. This happened on
5  June -- I was going to court and Inmate Thomas was right in
6  front of my face at that time and the State was supposed to
7  keep us separated from cell to cell going to court. He started
8  saying I did this and I did that.
9  Q. They're supposed to keep all the inmates separated
10 and you specifically from Inmate Thomas?
11 A. Me separate.
12 Q. From Inmate Thomas?
13 A. Yes.
14 Q. So let me ask you this: So it sounds as if, you
15 know, officers were aware of that fact that there were ongoing
16 issues, correct? Am I correct about that?
17 A. Right.
18 Q. Including Officer Stroy, but, again, on that
19 particular day when he un-cuffed this gentleman so that he
20 could walk to his cell, what evidence do you have that Officer
21 Stroy had any awareness that Inmate Thomas was about to swing
22 on you?
23 A. Because when he came in --
24 Q. And who is he?
25 A. Thomas.

**MICHAEL SNELLING vs. OFFICER STROY**
Michael Snelling on 05/30/2017

Pages 30..33

**Page 30**

1  Q. Okay.
2  A. He came in and swung and hit me. And then I was on
3  MOU. I can remember the officer coming back telling me that
4  Thomas said he talked Officer Stroy of letting him walk back to
5  his cell on his own.
6  Q. Okay.
7  A. That's a violation of the codes.
8  Q. I understand that. And that all could be true, but
9  that still doesn't answer my question. How could Officer Stroy
10 have known that he was going to take that opportunity, he being
11 Nyron Thomas, to swing on you, to attack you, to assault you?
12 A. I say this because any other person as me being in
13 that jail, not one officer or lieutenant ever let an inmate
14 walk to his cell with another inmate out of the cell. Instead
15 he's saying, go to your cell until I escort this inmate to the
16 jail.
17 Q. Okay. I understand that. And let's say he made a
18 very poor decision of doing that, but that still doesn't get to
19 the heart of how Officer Stroy would have known that this
20 gentleman would have taken the opportunity to try to attack
21 you. Do you have any evidence that Officer Stroy knew that
22 when he took those handcuffs off, that this gentleman was
23 coming to attack you?
24 A. I ain't got evidence on camera because I'm not trying
25 to get nobody for their money. It's just what happened to me

**Page 31**

1  could have happened to anybody.
2  Q. I understand. And that something that happened to
3  you was very bad. And I get that. But what I'm trying to get
4  at is with Officer Stroy, how did he have any idea what was
5  happening to you? You acknowledge you didn't have any idea of
6  what was about to happen to you, right?
7  A. When I got hit, --
8  Q. Say yes or no, and then you can explain your answer.
9  You didn't have any knowledge that this man was about to --
10 A. I never did.
11 Q. So how would anybody have known this man, other than
12 him, being Mr. Thomas, was about to swing on you?
13 A. Me and Thomas had ups and downs.
14 Q. I understand.
15 A. I'm getting to the part about Officer Stroy.
16 Q. Okay.
17 A. Officer Stroy had dealings with him. Officer Stroy
18 stood at that red zone. Instead of stopping this inmate to
19 come up to the stairs by him or getting that escort, which is
20 back up, which is a sergeant or lieutenant to escort this
21 inmate back to his cell. He stood at that red zone and watch
22 all this took place until I collapsed on my face.
23 Q. Well, when you say, watched all it took place, did
24 he --
25 A. As in the inmate approached me, --

**Page 32**

1  Q. Yes, as he approached you.
2  A. -- knocked me out.
3  Q. And he was one swing that he knocked you out?
4  A. With a weapon.
5  Q. Okay. With a weapon.
6  A. And when my head hit that ground, my back is still
7  messed up.
8  Q. I understand.
9  A. I barely could stand up.
10 Q. But with all that said, it's not as if there was an
11 ongoing fight that resulted between you and Thomas?
12 A. He should've called for backup and he never called
13 backup.
14 Q. But how do you know that? You said you passed out.
15 So how do you know if he never called for backup?
16 A. Listen, I'm not trying to confuse myself.
17 Q. I'm not trying to confuse either. But you said you
18 had hit the floor and passed out?
19 A. When I hit that floor -- you know how you get hit and
20 you hit the floor?
21 Q. Fortunately I've never had that to happen, but I can
22 imagine.
23 A. I got up and --
24 Q. But you did say that you passed out, right?
25 A. I passed out.

**Page 33**

1  Q. So how do you know he didn't call for backup?
2  A. Because when I came in and I got back up and sat on
3  the stairs, that's when I collapsed again. That's when the
4  lieutenant came in.
5  Q. Okay. But that doesn't mean Officer Stroy didn't
6  call backup? How do you know he didn't call backup?
7  A. I can't really say.
8  Q. That's exactly right.
9  A. I can't say.
10 Q. You can't say.
11 A. Anyway, from the beginning, we're looking at the
12 beginning.
13 Q. I understand.
14 A. When there should have been handcuffs on the inmate
15 and another escort in the cell of the zone at that time.
16 Q. I understand what you're saying. So your issue is
17 that he broke policy, but him breaking policy doesn't mean that
18 he was deliberately indifferent to the fact that this other
19 inmate -- that he knew that this other inmate was going to
20 assault you. What evidence do you have that he knew -- Officer
21 Stroy knew that the moment he took those handcuffs off that he
22 had an intention to come and assault you? And when I say, he,
23 I'm talking about Nyron Thomas.
24 A. I have a proof, but I sent the request in.
25 Q. Okay. Well, tell me what it is. That's why we've

MICHAEL SNELLING vs. OFFICER STROY
Michael Snelling on 05/30/2017

Pages 50..53

**Page 50**

1  at and that's the front entrance. He came in my direction and
2  knocked the stairs that way knowing there was a set of stairs
3  by the kiosk.
4   Q. So he bypassed the stairs and came in your direction?
5   A. Yes.
6    MR. JACKSON: He came towards your front?
7    THE WITNESS: He came towards me.
8    MR. JACKSON: So he didn't come from your blind side
9  or anything?
10    THE WITNESS: No, he just came straight at me. I
11  didn't pay no attention to him because my back was turned.
12  And all I felt was a deep punch.
13  BY MS. PALMER:
14   Q. You said your back was turned?
15   A. My back was like -- say, this is the kiosk. But my
16  back my like turned to the side. I seen him coming.
17   Q. Out of your peripheral vision you could see him
18  coming?
19   A. Right where the kiosk is.
20   Q. Okay.
21   A. I seen him coming at me from the entrance.
22   Q. Towards the front of your body?
23   A. Right. And missed the set of stairs.
24   Q. But you didn't think anything about it?
25   A. No.

**Page 51**

1    MR. JACKSON: So he wasn't running or anything?
2    THE WITNESS: No. I thought he was normal until I
3  hit that floor.
4    MR. JACKSON: Right.
5    THE WITNESS: I'm trying to remember everything I
6  can.
7    MR. JACKSON: And once he hit you, you pretty much
8  lost consciousness immediately?
9    THE WITNESS: Yeah. And then when I got up, I was
10  still shaking and blood was dripping all over the place.
11  It was everywhere. And I made it to the stairs. So the
12  words I could hear from Officer Stroy's mouth, sit down.
13  I sat down and tried to balance myself. And then the last
14  few words came from my mouth, I'm about to go into a
15  seizure. My body started locking up. When I fell off the
16  stairs, that's when they called backup.
17  BY MS. PALMER:
18   Q. So Officer Stroy was trying to render aid and he told
19  you to sit down. I mean, you were moving around obviously?
20   A. When I hit that floor, I got up.
21   Q. And that's when he told you to sit back down?
22   A. Yeah, because they didn't know what was broken or
23  what was messed up on.
24   Q. I understand.
25    MS. PALMER: Okay, that's it. Thank you so much, Mr.

**Page 52**

1  Snelling. She can send you a copy of the deposition here.
2    (DEPOSITION CONCLUDED AT 12:45 P.M.)

**Page 53**

1  CERTIFICATE OF REPORTER
2
3  GEORGIA, HOUSTON COUNTY:
4
5   I, Kimberly "Cissi" Goolsby, Georgia Certified Court
6  Reporter B-2043, certify that acting in such capacity
7  on May, 30 2017, I Reported the deposition of Michael Snelling
8  and on the foregoing pages, both inclusive, have
9  transcribed or have had transcribed under my direction
10  a true and accurate account of such testimony.
11
12  I FURTHER CERTIFY that I am not counsel for nor
13  related to any of the parties; nor am I interested in
14  the event or outcome thereof.
15
16  WITNESS MY OFFICIAL SEAL and signature, this 23rd day
17  of June 2017.
18
19
20
21
22
23           Kimberly B. Goolsby, CCR, B-203
24
25